**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY W. THOMPKINS** | : | **CIVIL ACTION - LAW** |
| **Plaintiff** | : | |
| | : | **NO: 4:04-CV-1626** |
| **vs.** | : | |
| | : | **(JUDGE  JFM)** |
| **KW INDUSTRIES, INC.,** | : | |
| **TACC, INC., and LITHONIA LIGHTING:** | | |
| **/ACUITY LIGHTING GROUP, INC.** | : | **VIA ECF** |
| **Defendants** | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

I.      STATEMENT OF FACTS:

        Defendant TACC, Inc. is in the business of selling numerous and varied supplies to the

hospitality industry.  TACC purchases lists of hotel and motel franchisees and mangers, and

distributes its catalogues to over ten thousand individuals on these lists.  TACC makes no effort to

determine if recipients of its catalogues are knowledgeable or sophisticated with respect to the use

or installation of any of the products in the catalog.  The products in the catalogue vary from ones

that require little sophistication or knowledge to install (e.g. toilet paper dispensers, floor mats) to

those that require substantial sophistication and/or expertise, such as the product involved in this

case.  See TACC's catalog attached to Plaintiff's engineering expert's Affidavit of Daryl Ebersole,

Exhibit 10, marked as Exhibit C.

        Mahendra Patel, the Manger of the Quality Inn in South Williamsport called Defendant,

TACC, Inc., and purchased four light poles with lighting fixtures to put in the outdoor parking lot at

the Quality Inn from the catalog. (Patel Deposition Transcript, marked as Plaintiff's Exhibit 1 at

Pages 50-54).  TACC, Inc., issued an Order for these materials to Defendant Lithonia Lighting dated October 8, 2002 (Plaintiff's Exhibit 2), and directed Lithonia to ship these items directly to the Quality Inn.  TACC, Inc., issued an Invoice to the Quality Inn dated October 9, 2002 (Plaintiff's Exhibit 3).  Lithonia Lighting issued an Invoice to TACC, Inc., dated October 10, 2002 (Exhibit 4) for the sale of these items.  The catalog number for these poles, which was listed in the TACC and Lithonia invoices as SSS254GT20DDB, was the same catalog number that appeared in a Lithonia Lighting sales publication as reflected in Lithonia's Technical Information for straight steel poles (Exhibit 5) Lithonia, in effect,  marketed these poles as its product.

Lithonia Lighting purchased the four light poles it shipped to the Quality Inn from Defendant, K.W. Industries, Inc.  K. W. Industries has admitted in discovery that it manufactured the poles and sold them to Lithonia Lighting without any instructions or warnings.  The only installation instructions that came with the poles were a one page document issued by Lithonia Light (Plaintiff's Exhibit 6) that showed where to install the anchor bolts for the pole foundation, which was delivered to the Quality Inn with the anchor bolts before the poles were installed (Tom Poleto Deposition Transcript, marked as Plaintiff's Exhibit 7, at Pages 64, 77 and 83).  Lithonia Lighting manufactured the light fixtures which were boxed separately and came with their own instructions and warnings that related only to installing the light fixtures.  (Poleto Deposition at Pages 59-60).

Mr. Patel had hired Third Party Defendant, Tom Poleto to install the light poles.  Mr. Patel had no reason to suspect that installation of the pole required any special knowledge or sophistication.  Patel testified that Poleto told him he, Poleto, was an electrician and he had installed light poles before.  (Patel Deposition Transcript at Page 75).  Patel did nothing to verify Poleto's

2

qualifications.  (Patel Deposition Transcript at Page 75).

Poleto testified that he was a construction worker and basically was a laborer, although he did

some electrical work as part of his job duties.  (Poleto Deposition Transcript at Pages 15-16, 20).

He was not an electrical contractor or a licensed electrician.  (Page 13, 36).  He had helped install

six or seven light poles in the past (Page 24).  He knew the poles had to be installed below the frost

line (Page 26), which he testified was 36 inches in depth.  (Page 28).

Poleto testified Patel told him he wanted the poles installed at the edges of his parking lots.

(Page 37).  Poleto said he told Patel that he did not think it was safe to install a pole on a slope

where Patel wanted it, but Patel said he did not care.  (Page 37).  Patel, in his testimony, denied

having such a conversation with Poleto about not putting a pole on a slope.  (Patel Deposition

Transcript at Pages 99-100).

Poleto had a friend assist him, who actually dug the holes.  (Poleto Deposition Transcript at

Pages 40-41).  Poleto told him to dig the holes approximately three feet deep.  (Pages 41-42).

Poleto testified Patel ordered Ready-Mix Concrete for the foundation.  (Poleto Deposition

Transcript at Page 43).  Poleto told Patel that he did not think it was safe to use Ready-Mix

Concrete in that situation, but Patel said that he was not going to pay the small load charge to get

concrete delivered.  (Page 44).

Patel did not obtain a building permit to install the poles, and said he already had a permit to

do other outdoor work on the building, although it did not specifically cover these poles.  (Patel

Deposition Transcript at Page 103).  Poleto did not apply for a permit because he thought Patel

already had one to do other work there.  (Poleto Deposition Transcript at Page 55).

Poleto testified that once the poles were installed they didn't work and needed to be rewired for a different voltage, and Patel wanted him to do this by leaning a ladder against the poles. (Poleto Transcript at Page 56). Poleto told Patel he would not use a ladder because it was not safe and he, Patel, needed to get a lift, which Patel refused to do. (Pages 56-57). Poleto did not return to finish work on the poles because Patel was refusing to pay him the balance owed for the job. (Poleto Deposition Transcript at Pages 80-81). Poleto testified that he followed the instructions that came with the poles for placement for the anchor bolts. (Poleto Deposition Transcript at Pages 64, 77 and 83). He further testified that if instructions had come with the poles stating how deep to dig the foundation and what diameter the foundation should be, he would have followed those instructions (Page 84).

Patel testified that Plaintiff Thompkins, his maintenance man, offered to fix the light that was not working by using a ladder and that he, Patel, told Thompkins to use a bucket lift rather than a ladder, but Thompkins insisted on using a ladder to do the work. (Patel Deposition Transcript at Pages 112-115). The Quality Inn did not have a big enough ladder to do this job, and Patel had to rent one. (Pages 116-117). On October 30, 2002, Patel observed Thompkins climb up the ladder with another worker named Mark holding the ladder. (Page 121). The ladder was not free-standing and was leaning against the pole. (Page 122). Patel went inside because it was raining. (Page 121). Then Mark came in and said Thompkins did not need him (Page 123). Patel could see Thompkins working at the top of the pole through the glass window of the hotel. (Pages 125-126). Then they didn't see Thompkins, so they went outside and found him lying on the parking lot unconscious. (Pages 125, 127). The pole he had been working on was lying on the ground.

4

(Pages 128-129).

Richard E. Daniels, an engineer, inspected the scene of the accident on November 7, 2002. (Daniels Deposition Transcript, marked as Plaintiff's Exhibit 8, at Pages 15, 18).  He measured the depth of the subject foundation hole at 17 inches.  (Pages 67-68).  He observed that the concrete foundation consisted of a circular pedestal with a diameter of 12 inches (Pages 48-49) and beneath it a mass of concrete with a diameter of approximately 14 inches (Pages 50-51).

Jon Dangle, a Code Enforcement Officer for South Williamsport, testified that to go below the frost line in that area required a depth of at least 42 inches.  (Dangle Deposition Transcript, marked as Plaintiff's Exhibit 9, at Page 20).

Plaintiff has submitted an Affidavit from his Engineering Expert, Daryl L. Ebersole in opposition to the Defendants' Motions for Summary Judgment which is marked as Plaintiff's Exhibit 10.  Ebersole is an experienced civil engineer as reflected in his curriculum vitae attached to his Affidavit as Exhibit A.  Ebersole reviewed deposition transcripts, photographs and exhibits and opined that the subject pole fell over when Thompkins climbed up the ladder and was resting against it because it did not have an adequate foundation beneath it.  (Affidavit at Paragraph 29) Ebersole opined that the foundation should have been 5 feet below ground and 18 inches in diameter.  (Paragraph 29)  The proper design of the foundation is not obvious, and requires special expertise and/or education.  The foundation that Poleto's assistant dug was 17 inches deep and 12 to 14 inches in diameter.  (Paragraph 28).  Ebersole opined that the instructions that came with the pole (attached to Ebersole's Affidavit as Exhibit D), which only showed where to install the anchor bolts, were clearly inadequate and made the product unsafe for its intended use.  (Paragraph 31)

5

Ebersole attached foundation and installation instructions from two other pole sellers, Aim Solar Corporation and X Sports (marked as Exhibits E and F), which provided illustrations of adequate pole installation instructions.  He opined that the Defendants should have provided instructions with this pole stating that for soils with a bearing value of 3000 PSI or greater the foundation diameter should have been 18 inches and the depth of the foundation 60 inches.  (Paragraphs 29, 31)  The instructions should also have advised the user to consult a local engineer if there were concerns about site-specific conditions.  (Paragraphs 31).

Ebersole stated in his Engineering Report (Exhibit B) at Page 3:

"Responsible pole manufacturers understand that the average person is not aware of how substantial the foundation needs to be.  Since the pole manufacturers know all the conditions that will be present with the exception of the soil bearing values, they provide to the purchaser, a foundation design that is adequate for a given soil bearing value.  When the pole manufacturer does this, the installer will recognize whether the requirements are significantly different from what was anticipated and will observe that a good design requires knowledge of the soil bearing value.  This indicates to the installer that it is necessary to obtain or test soil bearing value.  In this way a responsible pole manufacturer provides the information required for installers to install safe, adequate, foundations."

Ebersole noted that Defendant, TACC, Inc., specialized in selling a wide array of products directly to hotels and motels (Paragraphs 8-9) as illustrated in its catalog, a copy of which was attached to his Affidavit as Exhibit C.  The same generic kind of light pole and fixture that TACC, Inc., sold to the Quality Inn was depicted in the catalog at Page 17.  Ebersole stated that TACC, Inc., was not in the business of selling light poles as its primary product, or in the business of selling light poles directly to commercial contractors for installation, who would be considered sophisticated users of such products; but rather was selling poles and numerous other products to hotel and motel managers who are not sophisticated users.  (Affidavit at Paragraph 11).

6

Ebersole ultimately opined that if his recommended instructions had been given and followed, the pole would have withstood the weight of the ladder with Mr. Thompkins on it, and this accident would not have happened. (Affidavit at Paragraph 34).

II.    ARGUMENT:

    A.    The Legal Standard

Summary judgment is appropriate only when there is no genuine issue of material fact which is unresolved, and the moving party is entitled to a judgment as a matter of law. Rule 56 (c) Fed. R. Civ. P. Summary judgment is an extreme remedy and should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder can draw from them. Peterson v. Lehigh Valley Dist. Counsel, 676 F.2d 81,84 (3d Cir. 1982). Because summary judgment is a severe remedy, the Court should resolve any doubt about the existence of genuine issues of fact against the moving party. Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Such is the case here.

    B.    The danger was not obvious; and Defendants had a duty to provide instructions on how to install the pole.

A product may be defective for failing to provide adequate instructions on how to use or install it. Walton v. Avco, Corp., 530 Pa. 568, 610 A. 2d 454, 458-459 (1992); Williamson & F.D.I.B., Inc. v. Piper Aircraft Corp., 968 F. 2d 380, 383-384 (3rd Cir.

1992).  The duty to provide adequate instructions and warnings rests on all entities in the chain of distribution of the product including manufacturers, wholesalers and retailers as we have here.  <u>Childers v. Joseph</u>, 842 F. 2d 689, 695-696 (3rd Cir. 1988).  The Defendants argue that because Poleto testified he knew he had to dig a foundation below the frost line for safety reasons (Poleto Deposition Transcript, Plaintiff's Exhibit 7, at Pages 25-26), he had knowledge of the danger of digging a shallow foundation and therefore did not need to be given instructions or warnings about digging an adequate foundation.  This argument is devoid of merit.

Plaintiff's expert, Daryl Ebersole, states in his Affidavit, (Exhibit 10 at Paragraph 29, 31) that instructions should have been provided with the poles to dig a foundation 60 inches deep and 18 inches in diameter for a safe pole foundation.  This is much deeper than the frost line of 42 inches, and very much deeper than what Poleto thought the frost line was (36 inches).  Accordingly, Poleto did not know of the potential danger of failing to dig a  foundation lower than 36 inches or with a diameter of more than 12 to 14 inches and this was clearly something that was not obvious to him or other contractors like him.  Thus, it may be inferred Poleto had some knowledge that a shallow foundation hole could be dangerous if not dug below the frost line of 36 inches, but he did not know the full extent of the danger, that is, that the hole should have been 60 inches deep and 18 inches in diameter to be safe.  Where the evidence shows that users of a product had some knowledge of a danger, but not the full extent of the hazard, the seller still has a duty to warn of the full extent of the hazard.  See <u>Petree v. Victor Fluid Power, Inc.</u>, 831 F. 2d 1191 (3rd Cir.

1987) [Held:  it was error for the trial court to direct a verdict for a defendant in a failure to warn case where the jury could have found that foreseeable misuse by the purchaser's employees might have been avoided had the machine been accompanied by an adequate warning as to the full extent of the hazard, notwithstanding that employees had general knowledge that the machine had malfunctioned on several occasions].  See also Remy v. Michael D's Carpet Outlets, 391 Pa. Super. 436, 571 A. 2d 446 (1990) aff'd sub nom Kimco Dev. v. Michael D's Carpet, 536 Pa. 1, 637 A. 2d 603 (Pa. 1993) [Upheld verdict for plaintiff in failure to warn case where although plaintiff had general knowledge that foam padding was flammable, it was not warned of its capacity for rapid and uncontrollable spread of fire after ignition]; Pavlik v. Lane Limited/Tobacco Exporters Intern., 135 F. 3d 876, 889 (3rd Cir. 1988) [although plaintiff's decedent had been given warnings not to inhale butane, it was a disputed factual issue whether he was aware of the extreme consequences of doing so].  Likewise here, Poleto did not know the full extent of the hazard because he believed that a 36 inch deep foundation would be sufficient when in fact a 60 inch deep foundation with an 18 inch diameter was required to make it safe.

Ploeto's inaccurate knowledge concerning the frost line is at very best a red herring.  Had proper instructions been provided and followed, the foundation would have been several feet below the frost line, and this accident would have never occurred. Whether or not those instructions would have been followed is simply a jury questions.  The pole did not fall because the foundation was above the frost line; it fell because the foundation was woefully inadequate, given the dimensions of the pole.

9

The Pennsylvania Supreme Court has held that a product is defective if it is not safe for its intended users. Phillips v. Cricket Lighters, 576 Pa. 644, 841 A. 2d 1000 (2003) [Plurality opinion of Chief Justice Cappy]  The intended users here were hotels and motels and whatever contractors they hired to install the poles.  As illustrated by Poleto's deposition, these contractors could and did include unsophisticated construction workers who had little experience in pole installation and who did not know how to build a proper pole foundation.  Poleto's unsophistication and lack of knowledge is demonstrated by his belief that a pole foundation would be safe merely if it was installed below the frost line and his second mistake in belief that the frost line in this area was 36 inches.

Also, the fact that these poles were being used in a commercial setting does not permit a finding that its users will be sophisticated and knowledgeable of the dangerous involved.  See Doughtery v. Edward J. Meloney, Inc., 443 Pa. Super. 201, 661 A. 2d 375 (1995).  In Doughtery fireman monkeyed around with a valve on the boiler in their firehouse causing it to explode.  They sued the manufacturer for failure to warn not to tamper with an armature on the valve.  The Court rejected the Defendant's argument that because it was a commercial boiler any intended user would be knowledgeable about its operation and would not need to be warned.  The Court stated in pertinent part:

"Commercial boilers are used in churches, apartment buildings, office buildings, and many other types of non-residential buildings.  Persons knowledgeable about the operation of commercial heating systems are people who manufacture and repair such systems. Unless this valve was to be sold only to such people, appellant's argument fails.  There is no indication that apartment owners or fireman or clergymen or employees who are responsible for the general maintenance of office buildings are knowledgeable about how boilers operate, the purpose of appellant's valve, or the dangers of tapping appellant's valve to re-start an inoperable boiler.  The intended users of this product are no different

from anyone who owns a furnace in their home.  They do not necessarily know how it works.  We therefore reject appellant's argument that as a matter of law, the valve was safe for its intended users.  661 A. 2d 383

          \*                      \*                    \*

"We categorically reject these arguments based on appellant's total failure to produce any evidence that these firefighters were experienced boiler 'professionals' or, for that matter, that they even knew any more about boilers than the average person.  A manufacturer is not exempt from products liability law because he sells his products to commercial establishments.  These Plaintiffs were firefighters, not boiler repairmen.  This argument would be acceptable if appellant sold its valve for boilers which were sold only to heating system repairmen.

However, appellant presented no evidence that anyone at Engine 34 or Platoon C of Engine 27 knew how to operate or repair a boiler or knew what its valve did or did not do.  Firemen are knowledgeable about the properties and dangers of fires, not boilers.  Compare Mackowick v. Westinghouse Electric Corp., 525 Pa. 52, 575 A. 2d 100 (1990) (Electricians are knowledgeable about the properties of electricity)."  661 A. 2d 384.

Similarly here, TACC, Inc., was marketing these poles and a diverse array of other products to hotel and motel chains who had no sophistication in the installation of light poles.  These purchasers could end up hiring any fly-by-night contractor to install them who likewise may have no knowledge or, as  in Poleto's case, inaccurate knowledge, about how to install these poles.  Accordingly, the evidence permits an inference that the danger of an inadequate foundation was not obvious to the intended users to these poles and that the Defendants had a duty to provide instructions on how to construct a safe pole foundation.

C.      The evidence permits an inference that the lack of installation instructions was a direct cause of the accident.

In Remy v. Michael D's Carpet Outlets, Supra., the Plaintiff alleged that the

11

Defendant's failure to provide warnings about the highly flammable nature of the foam

padding it had sold and to provide instructions for proper storing methods for the foam

caused a conflagration when the foam ignited destroying the Plaintiff's building.   The

Superior Court upheld a  verdict for the Plaintiff on a failure to warn theory holding as

follows:

> 'Where the theory of liability is failure to warn adequately, the evidence must be
> such as to support a reasonable inference, rather than a guess, that the existence of an
> adequate warning may have prevented the accident before the issue of causation may be
> submitted to the jury.'  Conti v. Ford Motor Co., Supra. at 198.  See also: Staymates v.
> ITT Holub Industries, 364 Pa. Supra. 37, 527 A. 2d 140 (1987).  Michael D's maintains
> that if it had been warned that proper storage methods would decrease the risk of fire, it
> would have taken necessary precautions to prevent the rapid spread of a fire.  In reviewing
> the issue of causation, therefore, the proper focus of our inquiry is on additional precautions
> that might have been taken if there had been a warning.  See: Powell v. JT Posey, Co.,
> 766 F. 2d 131 (3rd Cir. 1985).  The fact finder must 'consider not only what did occur but
> also what might have occurred. . .such a determination as to what might have happened
> necessarily requires a weighing of probabilities.'  Hamil v. Bashline, 481 Pa. 256, 269-270
> 392 A. 2d 1280, 1286-1287 (1978).  Here, a jury could have found from the testimony
> that adequate warnings would have enabled Michael D's to install a sprinkler system or
> compartmentalize the storage of foam padding in order to minimize the risk of conflagration.
>  See Petree v. Victor Fluid Power, Inc., 831 F. 2d 1191 (3rd Cir. 1987).  Although
> Michael D's conduct when warnings were given after the fire was a relevant consideration
> for the jury, the failure to install sprinkler systems in its replacement store did not determine
> as a matter of law that precautions would not have been taken if adequate warning had
> been received prior to the fire.  A jury could find, therefore, that the failure to warn was a
> substantial factor in causing the conflagration.'  573 A. 2d 449-450.

The same is true here.  Poleto testified in his deposition that he followed the written diagram

instructions that came with the poles showing where to install the anchor bolts, and he

would have followed instructions for the depth and diameter of the pole foundation if such

instructions had come with the pole.   (Plaintiff's Exhibit 7 at Pages 64, 77, 83-84).

Plaintiff's expert Ebersole has opined that if the Defendants had provided the instructions he

recommended and if the installer had followed them, this accident would not have happened.  This evidence certainly permits an inference that the Defendants' failure to provide adequate installation instructions was a cause of this accident.

In addition, under Pennsylvania law there is a presumption that if adequate warnings or instructions were given, they would have been heeded by the user of the product.  See: Pavlik v. Lane Limited/Tobacco Exporters Intern., Supra., 135 F. 3d at 883; Fisher v. Walsh Parts Service, Co., Inc., 277 F. Supp. 496 (E.D. Pa. 2003); Colegrove v. Cameran Machine Co., 172 F. Supp. 611, 616 (W.D. Pa. 2001).  The Defendants have not rebutted this presumption.  They rely upon testimony by Poleto that he knew he had to dig the foundation below the frost line, and that he did not need any instructions on this, and they rely upon his admission that he did not read the instructions on how to install the light fixture that came with the pole.  However, as noted above, Poleto also testified that he followed the written diagram instruction that came with the poles showing where to install the anchor bolts in the foundation and that he would have followed instructions for the depth and diameter of the foundation if such instructions would have come with the pole. The jury could choose to believe this later testimony and disregard the earlier testimony which could tend to show he may not have followed installation instructions if they had been provided.  This is a classic question of credibility.  In considering a motion for summary judgment, the Court may not resolve issues of credibility, Dickerson v. US Steel Corp., 439 F. Supp. 55 (E.D. Pa. 1977) and may not resolve questions of disputed fact.  This Court must draw all inferences from the evidence in the record in the Plaintiff's favor.

13

<u>Pavlik v. Lane Limited/Tobacco Exporters Intern.</u>, supra. 135 F. 3d 880-881, fn. 2, 887.

As in <u>Pavlik</u>, 135 F. 3d at 889, the Plaintiff has met his burden of demonstrating that there is a disputed question of fact concerning the extent of the danger known to Poleto and whether additional information would have altered his course of conduct.  Accordingly, the Defendants' assertion that Plaintiff has failed to prove a prima facie case of causation must be rejected.

D.      The Learned Intermediary Doctrine does not apply in this case.

Defendant K. W. Industries has argued that the "Learned Intermediary Doctrine" applies to this case.  This is clearly not so.  That doctrine only applies to products prescribed by physicians to their patients such as prescription drugs and contraceptive devices. See <u>Brecher v. Cutler</u>, 396 Pa. Supra. 211, 578 A. 2d 481, 484-486 (1990) and cases cited therein.  The doctrine places a duty on the manufacturer of these prescription-required products to warn the prescribing physician of the dangers involved with the product, and places a duty on the prescribing physician to warn his patient about the dangers and proper usage of the product.  <u>Id</u> at 485.  The manufacturer has no duty to provide warnings directly to the patient using the drug or device.  <u>Id</u>.  Here, there is no learned intermediary physician prescribing a medical drug or device to a patient, which makes that doctrine simply not applicable.

Moreover, K. W. Industries' argument that it was not feasible for it to give instructions or warnings of proper foundation designed to customers in different geographical areas is controverted by the Affidavit testimony of Daryl Ebersole.  See

14

Ebersole Affidavit at paragraphs 31-32.  Ebersole also attaches foundation installation instructions from two other pole manufacturers, Aim Solar, Inc., and X Sports (Exhibits E and F attached to his Affidavit) illustrating the feasibility of issuing foundation installation instructions.

III.   <u>CONCLUSION</u>:

For all the above reasons, Plaintiff respectfully requests this Honorable Court to deny all three of the Defendants Motions for Summary Judgment.

Respectfully submitted,

ELION, WAYNE, GRIECO,
CARLUCCI, SHIPMAN & IRWIN, P.C.


   s/David C. Shipman
David C. Shipman, Esquire
Attorney for Plaintiff
ID#PA22016

## CERTIFICATE OF SERVICE

I, David C. Shipman, hereby certify that I have served the foregoing Plaintiffs' Brief in

Opposition To Defendants' Motions for Summary Judgment on the following, this 9th day of June

2005, as follows:

VIA ECF:

Robert A. Seiferth, Esquire
Attorney for TACC, Inc.
33 West Third Street, Suite 200
Williamsport, PA 17701

Jefferson Shipman
Attorney for K. W. Industries
Johnson, Duffy, Stewart and Widner
301 Market St., P.O.Box 109
Lemoyne, PA 17043

Ronald F. Negin, Esquire
Attorney for Lithonia Lighting
Bovis, Kyle & Burch
53 Perimeter Circle East, 3rd Floor
Atlanta GA 30346

Respectfully submitted,

ELION, WAYNE, GRIECO,
CARLUCCI, SHIPMAN & IRWIN, P.C.

  s/David C. Shipman
David C. Shipman, Esquire
Attorney for Plaintiff
ID#PA22016

Robert B. Elion, Esquire
Attorney for Plaintiff
ID#PA21030
125 East Third Street
Williamsport, PA 17701

Mark Schultz, Esquire
Attorney for Plaintiff
ID#21650
Cozen & O'Connor
1900 Market Street

P.O. Box 800
Philadelphia, PA 19103